UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

NELL WALTON,                          )
                                      )
            Plaintiff,                )
                                      )
v.                                    )      No.:   3:06-CV-292
                                      )             (VARLAN/GUYTON)
NOVA INFORMATION SYSTEMS,             )
a Division of U.S. BANCORP,           )
                                      )
            Defendants.               )

## MEMORANDUM & ORDER

Plaintiff Nell Walton ("Plaintiff") filed the present civil action against NOVA Information Systems ("NOVA"), a Division of U.S. Bancorp ("USB") (hereinafter collectively referred to as the "Defendants"), alleging violations of the Sarbanes-Oxley Act ("SOX"), the Americans with Disabilities Act ("ADA"), the Family Medical Leave Act ("FMLA"), wrongful discharge under Tennessee law, and the Tennessee Public Protection Act ("TPPA").  Defendants filed a motion for summary judgment [Doc. 30], which is ripe for determination.

The Court has carefully considered the parties' briefs and supporting materials [Docs. 30, 31, 32, 45, 47, 58] in light of the entire record and controlling law.  For the reasons set forth herein, the Defendants' motion for summary judgment [Doc. 30] will be **GRANTED in part** and **DENIED in part**.

# I.    RELEVANT FACTS

Defendant NOVA, a division of Defendant USB, is a credit card processing company and former employer of the Plaintiff. [Docs. 31 at 3; 45 at 6.]  In March of 2003, Plaintiff began working at NOVA's Knoxville, Tennessee, office as a database administrator ("DBA"), whose responsibility was to ensure that NOVA's systems and databases kept running. [Doc. 32-3 at 4-5.] When she began working for NOVA, Plaintiff received an employee handbook that included information on Defendants' attendance and leave policies. [Doc. 32-5 at 2-43.]

After about six months, there was a reorganization at NOVA, and Rakesh "Rocky" Gupta ("Gupta") became Plaintiff's immediate supervisor in the Datawarehouse Group. [Docs. 32-3 at 5; 40, Ex. 28.] Plaintiff's responsibility to keep the databases running initially remained the same, but her duties changed in early 2004 when many employees in the information technology department were assigned to the CISP project, which involved securing databases to comply with credit card industry requirements set by VISA. [Doc. 32-3 at 5-6.]  Plaintiff's focus was database security, including access control and applying security patches. [Doc. 32-3 at 9.]  The CISP project was expected to be completed around September of 2004 [Doc. 32-3 at 8.] The following year, CISP was replaced with a similar project involving the "Payment Card Industry Data Security Standard" ("PCI"). [Doc. 32-3 at 9.]

In March of 2004, Frank Erjavec ("Erjavec") became Plaintiff's immediate supervisor, and she allegedly disliked how her work assignments changed frequently under Erjavec's

leadership. [Doc. 32-3 at 11.] Plaintiff also perceived Erjavec and another DBA, Margaret Norman ("Norman"), as too controlling over the databases and not allowing her to use her technology experience. [Doc. 32-3 at 11.] On June 23, 2004, Erik Toivonen ("Toivonen"), NOVA's Executive Vice President for Systems and Technology, sent an email asking employees for input on "topics most common and germane to our S&T organization" for an upcoming "All Hands" meeting. [Doc. 32-7 at 2.] Plaintiff responded the next day with a document outlining ten topics, including the open door policy, ethics and accountability, and security. [Doc. 32-7 at 2-3.] For the security topic, Plaintiff wrote:

> Security is extremely important at NOVA, but people who know little about S&T are making some decisions regarding security in a vacuum. How can we resolve this? We have wasted a lot of time trying to figure out a way to implement security policies that are just not workable - to the point of throwing away the day-to-day tasks we have to do to keep the business running effectively.

[Doc. 32-7 at 3-4.] After the All Hands meeting on June 29, 2004, Plaintiff met with Toivonen, and they allegedly discussed her perception of ethical problems involving favoritism and unkind treatment of employees at NOVA [Docs. 32-3 at 12-14; 32-8.] Plaintiff expressed her opinion that she found Gupta to be a poor manager. [Doc. 32-3 at 14.] There was also some discussion of the CISP project. [Doc. 32-3 at 12-14.] After the meeting, Toivonen assured Plaintiff several times that there would be no retribution as a result of their conversation. [Docs. 32-3 at 16; 32-8 at 2.]

On June 30, 2004, Gupta emailed his department that "all issues must be raised to [another supervisor] or [Gupta] before they are raised in any public forum." [Doc. 40, Ex. 6.]

The email warned that "[i]f anyone other than [another specific supervisor] or [Gupta] raises any issue in a public forum outside of our group they will be subject to disciplinary action." [Doc. 40, Ex. H.] Plaintiff forwarded the email to Toivonen the same day and expressed her concern about Gupta's email. [Doc. 40, Ex. H.] On the same day, Toivonen responded to Plaintiff that he interpreted Gupta's email as "wanting to ensure the team is not going around him or [another specific supervisor] with issues without first giving them the chance to respond and/or resolve." [Doc. 40, Ex. H.] In response to Plaintiff's view that Gupta's email was threatening disciplinary retribution, Toivonen wrote, "I totally agree. This is the first written example of a threat I have seen and I will deal with it appropriately." [Doc. 40, Ex. H.] Toivonen allegedly spoke to Gupta about the email and put a professional development plan in place for Gupta to strengthen his management style. [Doc. 32-10 at 4.] Toivonen also spoke to Stacy Fluech ("Fluech"), Director of Human Resources, "to make sure that they understood the concerns." [Doc. 32-10 at 4.]

On August 25, 2004, Plaintiff left a voicemail message for Gupta that said:

Rocky, this is Nell. The paint here in Knoxville is causing my throat to close up and I am bleeding out of my eyes. I will have to take at least the next two weeks off and maybe the entire month of September. I will try to work from home.

[Doc. 32-11 at 2.] Plaintiff received a "written warning regarding unacceptable and unprofessional behavior" from Gupta as a result of this incident on August 30, 2004. [Doc. 32-11 at 2.] According to the written warning, Plaintiff intended the message to mock her coworker, Norman, who was allegedly out on sick leave due to asthma aggravated by fumes

generated by paint used to remodel the Knoxville office. [Doc. 32-11 at 2.] Plaintiff was disciplined for acting "in an unprofessional manner whereby she demonstrated inappropriate behavior." [Doc. 32-11 at 2.] In the employee response section of the written warning, Plaintiff commented that she "totally agree[d] the comment was inappropriate" and expressed how her "deep resentment" of Norman's absences led her to leave the inappropriate message. [Doc. 32-11 at 2.] On September 3, 2004, Plaintiff emailed Fluech that the written warning had been "difficult for [her] to deal with psychologically" and had left her "stressed, demoralized and somewhat depressed." [Doc. 32-12 at 2.] Plaintiff indicated that she was seeing a counselor and would be working on anger management and other workplace coping strategies. [Doc. 32-12 at 2.]

On October 1, 2004, Plaintiff wrote a letter to "Human Resources Compliance Manager" and requested "some specific accommodations under the Americans with Disabilities Act." [Doc. 32-13 at 2.] Plaintiff stated that she needed "to work in a structured environment where I am very clear on what is expected of me and I am very clear on policies and procedures." [Doc. 32-13 at 2.] In her letter, Plaintiff included several accommodation suggestions including having clear written instructions, having an "on-call" calendar, having flexibility for working from home, reducing the noise level in her work area, and working with a different supervisor. [Doc. 32-13 at 2.] On October 8, 2004, Sophronia Fisher ("Fisher") of NOVA's Human Resources responded to the request by asking for additional information, including an accommodation form to be completed by Plaintiff's physician.

[Doc. 32-14 at 2.] On October 18, 2004, Gupta informed the DBAs that they were to carry their pagers at all times and were on-call 24/7. [Doc. 32-3 at 18.]

On October 20, 2004, Plaintiff submitted to NOVA's Human Resources an accommodation form filled out by her counselor. [Doc. 32-16 at 2-5.] The accommodation form identified Plaintiff's medical condition as depression and stress. [Doc. 32-16 at 4.] The counselor recommended accommodations included Plaintiff receiving "clear instructions on all assigned tasks, deadlines and projects" in addition to having an "on-call calendar" and reduction in noise in Plaintiff's work area. [Doc. 32-16 at 4.] The counselor also wrote that "[a]s long as tasks and duties are clearly defined, [Plaintiff] should have no problems performing her job functions." [Doc. 32-16 at 3.] On October 21, 2004, Human Resources asked some follow-up questions regarding the counselor's recommendations, and Plaintiff responded the next day with a three-page document explaining the accommodation requests. [Doc. 32-17 at 2, 4.]

Around early to mid-November of 2004, Plaintiff spoke to David Brattain ("Brattain"), NOVA Senior Vice President, Global Systems Operations and Production Support. [Doc. 32-3 at 18.] According to Plaintiff, she informed Brattain of her medical condition, and he allegedly informed Plaintiff that she was being transferred to another department to improve her situation and moved her office in the mean time per Plaintiff's request. [Doc. 32-3 at 18.] Around November 16, 2004, another reorganization occurred at NOVA, and Larry Smith ("Smith") became Plaintiff's supervisor in the Integration

Technologies department, though much of her direction came from Frank Bolling ("Bolling"). [Docs. 32-3 at 20; 40, Ex. 28.]

On November 19, 2004, Plaintiff sent an email to several NOVA supervisors about a situation involving one of NOVA's databases. According to Plaintiff, the software producer would stop supporting the version of the database used by NOVA after December 31, 2004. Plaintiff recommended purchasing extended support or migrating the database to newer software that was supported by the software producer. Plaintiff also discussed other perceived complications regarding the database. [Doc. 44, Ex. M.]

After Brattain asked Plaintiff to update him regarding her work changes on January 6, 2005, Plaintiff responded the next day that she was satisfied with her new office location and new supervisors. [Doc. 32-18 at 2.] However, she indicated issues with others "attempting to dump unpleasant/unwanted work off on other departments" and human resources not addressing her medical condition. [Doc. 32-18 at 2.] Brattain forwarded Plaintiff's email to Human Resources and wrote, "One concern, we have to make sure that inspite [sic] of [Plaintiff's] situation that she will be able to do her job." [Doc. 32-18 at 2.] On January 14, 2005, Plaintiff wrote Brattain asking questions about what team was responsible for particular duties after the reorganization. [Doc. 32-19 at 3.] After Brattain responded, Plaintiff enthusiastically thanked Brattain for his response (THANK YOU SIR!!!!!!!  YOU ARE THE BEST!!). [Doc. 32-19 at 2.]  But on January 29, 2005, Plaintiff again wrote Brattain indicating that she had a "relapse of [her] condition." [Doc. 32-20 at 2.] Rather than problems with her post-reorganization job, Plaintiff complained of "occupational

stress" coming from other groups allegedly "pressuring [her] to do work outside of what [she] should be doing." [Doc. 32-20 at 2.] Plaintiff concluded, "I guess I'm out until the professionals clear me to come back to work." [Doc. 32-20 at 2.]

On February 2, 2005, Plaintiff met with Fluech from NOVA's Human Resources. [*See* Docs. 32-21; 32-22.] Plaintiff allegedly talked about how the 24/7 on-call status resulted on her being called three to four times in a week. [Doc. 32-22 at 4.] Plaintiff also complained about the lack of productivity by Norman, another DBA whom Plaintiff had mocked in the voicemail to Gupta months earlier. [Doc. 32-22 at 4.] Fluech communicated Plaintiff's concerns to Brattain and asked whether on-call status could be rotated because it would reduce Plaintiff's stress. [Doc. 32-22 at 4.] Brattain responded in an email on February 4, 2005, that Plaintiff was "not a 24/7 on call resource any more than anyone else in the production support group." [Doc. 32-22 at 4.] Brattain also described Plaintiff's duties performing maintenance and upgrades on a particular database and resolving issues and problems associated with that database. [Doc. 32-22 at 4.] As for Plaintiff's issue with Norman, Brattain indicated he would speak to Plaintiff's supervisor, Smith. [Doc. 32-22 at 4.]

On February 9, 2005, Plaintiff submitted a letter from Dr. Cathy Mathes updating Fluech on Plaintiff's medical condition. [Doc. 32-24 at 3.] Dr. Mathes stated that Plaintiff was being treated for "severe situational depression" with a mix of medication and counseling. [Doc. 32-24 at 3.] Dr. Mathes indicated that the following modifications to Plaintiff's work environment could further assist in her recovery: (1) have a schedule as to

when Plaintiff would need to be available outside of normal work hours; (2) having a clear definition of who assigns tasks and what tasks are to be done; (3) having flexibility in her work schedule; and (4) having management check-in with Plaintiff periodically. [Doc. 32-24 at 3.]

On February 22, 2005, Plaintiff spoke to Bolling about her request for an accommodation. [Doc. 32-25 at 2.] Plaintiff indicated that they spoke about her job description, scheduling, and Plaintiff's problems with workload and staff responsibilities. [Doc. 32-25.] In an email from March 1, 2005, Bolling indicated to Fluech that being on call 24/7 would be an essential job function for Plaintiff's position. [Doc. 32-26 at 2.] In a meeting early in March of 2005, Fluech allegedly told Plaintiff that the on-call schedule accommodation could not be met, though Plaintiff could consider taking short-term disability, long-term disability, or FMLA. [Doc. 32-4 at 36.] Plaintiff allegedly responded that she would take the suggestion under consideration. [Doc. 32-4 at 36.]

On March 8, 2005, Plaintiff sent an email entitled "Security Compliance Audit 2005" to Bolling, William Hodge, Jefri Hillon, and Larry Smith. [Doc. 40, Ex. 26.] The email identified perceived database compliance issues that she felt needed "to be addressed ASAP." [Doc. 40, Ex. 26.] According to Plaintiff, she researched for two to three weeks prior to sending the email and did so on her own initiative. [Doc. 32-3 at 36.] According to Plaintiff, the email addressed matters relating to both the previous 2004 audit and the upcoming 2005 audit of database security at NOVA. [Doc. 32-3 at 36.]

On March 14, 2005, Plaintiff emailed Fluech that she was feeling "extremely ill" and believed that she was "going to have to take short-term disability." [Doc. 32-27 at 2.] According to Defendants, Plaintiff applied for and was approved for disability benefits through April 14, 2005, by NOVA's short-term disability carrier, The Hartford. [Doc. 31 at 9.] Plaintiff applied for workers compensation benefits and received information from USB on the workers compensation process on April 14, 2005, but she was eventually denied such benefits. [Docs. 32-4 at 35; 32-28.]

On March 16, 2005, while on leave, Plaintiff sent an email entitled "Current Cardholder Database Vulnerabilities/PCI Non-Compliance" to William Hodge, Shane Cruze, Jefri Hillon, Adrian Sanabria, Bob Pottratz, and Larry Smith. [Doc. 40, Ex. 27.] The email indicated that Plaintiff had "found the following items that are non-compliant with the Payment Card Industry Data Security Standard ("PCI")." [Doc. 40, Ex. 27.] PCI was similar to the previous CISP project that Plaintiff and others had worked on in 2004. [Doc. 32-3 at 39.] According to Plaintiff's email, she believed that NOVA was non-compliant with PCI and was, thus, non-compliant with certain federal laws. [Doc. 40, Ex. 27.] Similar to the March 8, 2005, email, Plaintiff created the March 16, 2005, on her own initiative and as a result of her own legal research. [Doc. 32-3 at 39-40.] Smith forwarded Plaintiff's email to Bolling who then forwarded the email to Brattain and another individual. [Doc. 47, Ex. L.] Bolling added, "FYI, Nell sent this out. These issues should be escalated through her chain of command." [Doc. 47, Ex. L.] Brattain subsequently forwarded the email to Fluech and

wrote, "This is part of the issue. I cannot trust her to do this work and distribute this information appropriately." [Doc. 47, Ex. L.]

On April 11, 2005, and while still on short-term disability, Walton filed a complaint with the Department of Labor/Occupational Safety and Health Administration ("DOL/OSHA") that alleged a violation of 18 U.S.C. § 1514A. [Doc. 40, Ex. 28.] In particular, the complaint discussed Plaintiff's alleged concerns with database security at NOVA. [Doc. 40, Ex. 28.]

On May 1, 2005, Walton emailed Fluech, "My doctor still has not released me to return to work." [Doc. 32-32 at 2.] According to Defendants, the Hartford informed NOVA that Plaintiff no longer met the definition of disabled and was no longer eligible for continued disability benefits on July 22, 2005. [Doc. 31 at 10.] On August 2, 2005, Plaintiff submitted a letter to NOVA asking for vacation from August 4 to August 24, 2005, and medical leave without pay from August 25 to December 31, 2005. [Doc. 32-34 at 3.] Plaintiff attached a letter from her psychiatrist, Dr. Catherine Gyurik, that stated, "The above is my patient and can not return to work at NOVA. The work environment would be detrimental to her health since it is perceived as hostile." [Doc. 32-33 at 2.]

In response, Fluech asked Plaintiff on August 24, 2005, to provide an updated statement from her physician indicating that the work environment would be detrimental to her medical condition. [Doc. 32-39 at 2-4.] Dr. Gyurik filled out the accommodation form and wrote that Plaintiff "is in good remission. She can function except in previous job situation." [Doc. 32-39 at 2-4.]

In response to Plaintiff's accommodation request, Fluech wrote on August 30, 2005:

> Your psychiatrist has indicated your condition is in remission with the exception that you cannot return to work at NOVA. She has further indicated that there is nothing the company can do to enable you to return back to work. We are not able to grant your request for an extended personal leave. Therefore, unless you are able to return to work by Tuesday, September 6, 2005, your employment will be terminated for failure to return from a leave.

[Doc. 32-40 at 2.] On August 31, 2005, Plaintiff responded that her work restriction would only last for another 90 days and that she could not return to work on September 6, 2005. [Doc. 32-41 at 2.] Plaintiff also indicated in her letter to Fluech that she perceived retaliation for filing a DOL/OSHA complaint. [Doc. 32-41 at 2.] Plaintiff was terminated from NOVA on September 6, 2005.

## II. ANALYSIS

### A. Standard of Review

Under Fed. R. Civ. P. 56(c), summary judgment is proper if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." The moving party bears the burden of establishing that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 n.2 (1986). The court must view the facts and all inferences to be drawn therefrom in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Burchett v. Kiefer*, 310 F.3d 937, 942 (6th Cir. 2002). To establish a genuine issue as to the existence of a particular element, the non-moving party must point to evidence in the record upon which

a reasonable jury could find in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The genuine issue must also be material; that is, it must involve facts that might affect the outcome of the suit under the governing law. *Id.*

The judge's function at the point of summary judgment is limited to determining whether sufficient evidence has been presented to make the issue of fact a proper jury question. *Id.* at 249. The judge does not weigh the evidence, judge the credibility of witnesses, nor determine the truth of the matter. *Id.* Thus, "[t]he inquiry performed is the threshold inquiry of determining whether there is the need for trial - whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* at 250.

## B.   SOX - Whistleblower Protection

Plaintiff claims that Defendants violated SOX's whistleblower protection provision ("Section 806"). The statute provides that publicly traded companies may not "discharge, demote, suspend, threaten, harass, or in any other manner discriminate against an employee in the terms and conditions of employment because of any lawful act done by the employee." 18 U.S.C. § 1514A(a). Such protected activities are:

(1)  to provide information, cause information to be provided, or otherwise assist in an investigation regarding any conduct which the employee reasonably believes constitutes a violation of section 1341, 1343, 1344, or 1348, any rule or regulation of the Securities and Exchange Commission, or any provision of Federal law relating to fraud against shareholders, when the information or assistance is provided to or the investigation is conducted by – (A) a Federal regulatory or law enforcement agency; (B) any Member of Congress or any committee of Congress; or (C) a person with supervisory authority over the employee (or such other person working for the

employer who has the authority to investigate, discover, or terminate misconduct); or

(2) to file, cause to be filed, testify, participate in, or otherwise assist in a proceeding filed or about to be filed (with any knowledge of the employer) relating to an alleged violation of section 1341, 1343, 1344, or 1348, any rule or regulation of the Securities and Exchange Commission, or any provision of Federal law relating to fraud against shareholders.

18 U.S.C. § 1514A(a).

To prevail on a Section 806 claim, a plaintiff must prove that: (1) she engaged in a protected activity or conduct; (2) the employer knew or suspected, actually or constructively, that she engaged in the protected activity; (3) she suffered an unfavorable personnel action; and (4) the circumstances were sufficient to raise the inference that the protected activity was a contributing factor in the unfavorable action. *See Allen v. Admin. Review Bd.*, 514 F.3d 468, 475-76 (5th Cir. 2008); 29 C.F.R. § 1980.104(b). If a plaintiff establishes these four elements, an employer "may avoid liability if it can prove 'by clear and convincing evidence' that it 'would have taken the same unfavorable personnel action in the absence of that [protected] behavior.'" *Allen*, 514 F.3d at 476 (alteration in original) (citing 49 U.S.C. § 42121(b)(2)(B)(iv)). Notably, this framework is "distinct" from the *McDonnell Douglas* burden-shifting framework applicable to other types of employment retaliation claims, such as those pursued under Title VII. *Allen*, 514 F.3d at 476.

In support of their motion for summary judgment, Defendants argue that Plaintiff cannot establish that she engaged in a protected activity. Defendants make several arguments as to why Plaintiff has not established this element of the prima facie case.

Defendants first contend that Plaintiff's complaints failed to implicate the substantive law of SOX "definitively and specifically." They rely on cases like *Van Asdale v. Int'l Game, Tech.*, which recognized that "the whistleblower may only claim the protection of SOX where the 'reported information . . . [has] a degree of specificity [and] . . . state[s] particular concerns, which, at the very least, reasonably identify a respondent's conduct that the complainant believes to be illegal.'" 498 F. Supp. 2d 1321, 1330 (D. Nev. 2007) (alterations in original) (citation omitted). In other words, "the whistleblowing cannot be vague." *Id.* at 1330.

> In the present case, Plaintiff's March 16, 2005, email states:
>
> The PCI incorporates standards set to comply with federal regulations including the Sarbanes-Oxley Act (Sec. 404) and the Gramm-Leach Bliley Act. In the PCI definition below each citation generally reflects non-compliance with any or all of these, as this legislation require [sic] require financial institutions to maintain strict internal controls to protect both consumers and businesses from being victims of debacles like Enron, WorldCOM and Tyco.

[Doc. 40, Ex. 27.] The email specifically identifies perceived non-compliance areas by Defendants and cites a specific section of SOX. Thus, Plaintiff has met the minimal requirement of identifying conduct by Defendants that she believed to be illegal, as discussed in cases like *Van Asdale*. 498 F. Supp. 2d at 1330. This is not a case involving "vague" whistleblowing.

Nevertheless, to prevail on her SOX claim, Plaintiff must still satisfy the "reasonable belief" standard provided by Section 806. 18 U.S.C. § 1514A. To satisfy the reasonable belief standard, Plaintiff "must show not only that [she] believed that the conduct constituted

a violation, but also that a reasonable person in [her] position would have believed that the conduct constituted a violation." *Livingston v. Wyeth*, No. 06-1939, 2008 WL 756068, at *8 (4th Cir. Mar. 24, 2008). In other words, Section 806 requires "both a subjective belief and an objectively reasonable belief that the company's conduct constitutes a violation of the relevant law." *Id.* Furthermore, the plain language of SOX requires a reasonable belief regarding an existing violation, not a "belief that a violation is about to happen upon some future contingency." *Id.*

In the present case, Defendants argue that, despite her conclusory allegations, the Plaintiff's complaints substantively do not implicate any rules or sections of SOX and, thus, her SOX claim fails to satisfy the "reasonable belief" standard. In particular, Defendants rely on Plaintiff's admissions that she was not involved with preparations of financial statements or what information would be included in a financial statement. [Docs. 32-4 at 11; 40, Ex. 1(c).] Plaintiff responds that her complaints implicated internal control requirements established by the Securities and Exchange Commission ("SEC") and the Office of the Comptroller of the Currency of the Department of the Treasury ("OCC") and described in 15 U.S.C. § 7241 ("Section 302"), 15 U.S.C. § 7262 ("Section 404"), 18 U.S.C. § 1350 ("Section 906"), and 17 C.F.R. § 229.303(3).

In analyzing the reasonable belief issue, the Court is guided by the Fourth Circuit's recent decision regarding an employee's Section 806 claim. In *Livingston v. Wyeth*, an employee complained to management about "serious deficiencies" in the implementation of a required training program and observed that the company would likely not meet

compliance deadlines. *Livingston*, 2008 WL 756068, at *6. The employee warned that his employer would provide false and misleading information in violation of federal law if it did not indicate to outside auditors that additional time was needed to become compliant with training program deadlines. *Id.* The employee was subsequently terminated and claimed retaliation under SOX. In affirming the grant of summary judgment dismissing the employee's Section 806 claim, the Fourth Circuit focused on the lack of evidence of the employer manifesting "even an intent to misrepresent facts or conceal any wrongdoing concerning training documentation." *Id.* at *9. The Fourth Circuit found that the employee's complaints relied on speculative future contingencies that failed to establish "reasonable belief" of a violation of securities laws. *Id.* at *8-9 ("This chain of speculation is simply too long to support a claim that [the employer] in fact covered up anything and made misrepresentations to the FDA or was in the process of doing so, as is required to support a violation of securities laws.")

Likewise in the present case, the Plaintiff's complaints about database security compliance are too speculative for a reasonable belief of a violation of securities laws. The statutes and regulations relied upon by the Plaintiff only address reporting and disclosure requirements by management. *See* 15 U.S.C. § 7241 (addressing certain certifications in annual or quarterly reports); 15 U.S.C. § 7262 (discussing rules regarding the inclusion of internal control reports in annual reports); 18 U.S.C. § 1350 (requiring certification of periodic financial reports), and 17 C.F.R. § 229.303(3) (providing guidance on descriptions that need to be included on reports regarding the results of operations). Thus, Plaintiff's

17

complaints to Defendants regarding database security were at best potential violations of the cited statutes if the security standards were not met *and* the required disclosures and reports were not made by management, with which Plaintiff admits she was not involved or had familiarity. [Docs. 32-4 at 11; 40, Ex. 1(c).] Examining the record, there is no evidence that Defendants intended to not make the disclosures required by Section 302, Section 404, Section 906, or 17 C.F.R. § 229.303(3) at the time of Plaintiff's complaints. At best, Plaintiff had a "belief that a violation [was] about to happen upon some future contingency," namely the failure to comply with database security standards *and* the failure to make required disclosures. *Livingston*, 2008 WL 756068, at *8. However, as the *Livingston* court recognized, such speculative beliefs do not comprise an existing violation as required by Section 806. *Id.* at *8-10. Accordingly, summary judgment will be granted as to the SOX claim because Plaintiff cannot establish that she engaged in a protected activity. Because Plaintiff cannot establish that element of the prima facie case, it is unnecessary for the Court to address the parties' other arguments regarding the SOX claim.

## C. **ADA - Discrimination Because of Disability**

Plaintiff's first claim under the ADA is that the Defendants discriminated against her when they allegedly refused to allow her reasonable accommodation and terminated her from her employment due to her alleged disability.

The ADA provides that "[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee

compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). To recover for discrimination under the ADA, a plaintiff must show that (1) she is an individual with a disability; (2) she is otherwise qualified to perform the job requirements with or without reasonable accommodation; and (3) the employer relied upon the plaintiff's disability in making its employment decision or by introducing indirect evidence of discrimination to shift the burden of production to the employer to articulate a legitimate, nondiscriminatory reason for making its adverse employment decision. *Todd v. City of Cincinnati*, 436 F.3d 635, 638 (6th Cir. 2006); *Walsh v. United Parcel Serv.*, 201 F.3d 718, 724 (6th Cir. 2000); *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1178 (6th Cir. 1996).

In the present case, Defendants contend that Plaintiff cannot establish the prima facie case for disability discrimination. Specifically, they contend that (1) Plaintiff is not a person with a disability and (2) even if Plaintiff was disabled, she was not qualified for her position because she was unable to perform her job either with or without a reasonable accommodation. Plaintiff responds that the disability and essential job duty issues are questions of fact not suitable for resolution through a motion for judgment as a matter of law. In their reply, Defendants reiterate their position that Plaintiff is not disabled because her impairments did not substantially impair a major life activity and that Defendants sufficiently accommodated Plaintiff through several means other than relieving her from on-call status.

As to the "disabled" issue, Defendants claim that Plaintiff's impairments were not substantially limiting and only temporary in nature. The ADA defines disability as "(A) a

physical or mental impairment that substantially limits one or more of the major life activities

of such individual; (B) a record of such an impairment; or (C) being regarded as having such

an impairment." 42 U.S.C. § 12102(2). According to the regulations, the term "substantially

limits means: (i) Unable to perform a major life activity that the average person in the general

population can perform; or (ii) Significantly restricted as to the condition, manner or duration

under which an individual can perform a particular major life activity as compared to the

condition, manner, or duration under which the average person in the general population can

perform that same major life activity." 29 C.F.R. § 1630.2(j)(1). Factors to be considered

in determining whether an individual is substantially limited in a major life activity include

(1) the nature and severity of the impairment; (2) the duration or expected duration of the

impairment; and (3) the permanent or long term impact, or the expected permanent or long

term impact of or resulting from the impairment. *Novak v. MetroHealth Med. Ctr.*, 503 F.3d

572, 581-82 (6th Cir. 2007); 29 C.F.R. § 1630.2(j)(2).

After reviewing the record, there is insufficient evidence of Plaintiff having a

"physical or mental impairment that substantially limits one or more of the major life

activities." 42 U.S.C. § 12102(2). Plaintiff's deposition testimony shows that the limits on

many of her non-working life activities were not severe, long-term, or permanent in nature.

In her deposition, Plaintiff testified that she was unable to care for her horses for about a

month, was unable to drive for at most two weeks, and did not take a bath for a few days.

[Doc. 32-4 at 21, 22, 23.] Plaintiff further testified that her problems were largely

concentrated to a six-week period. [Doc. 32-4 at 24.] Thus, Plaintiff's limitations on her non-working life activities were relatively minimal and short in duration.

The evidence also does not indicate substantial limitations with regard to the major life activity of working. The Supreme Court has recognized that "[w]hen the major life activity under consideration is that of working, the statutory phrase 'substantially limits' requires, at a minimum, that plaintiffs allege they are unable to work in a broad class of jobs." *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 491 (1999). Similarly, the regulations state that "[t]he term substantially limits means significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities." 29 C.F.R. § 1630.2(j)(3)(i). In the present case, Plaintiff testified that she was unable to work and lost some cognitive function as a result of her mental problems during the relevant period. [Doc. 32-4 at 25, 27.] However, she also testified that she was able to read, write, use the computer, use email, and perform legal research during the same period of time. [Doc. 32-4 at 25-28.] Thus, her ability to perform these various tasks during that time indicates that she was not significantly restricted in the ability to perform a class of jobs or broad range of jobs.

Additionally, "[t]he inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working." 29 C.F.R. § 1630.2(j)(3)(i). In her deposition, Plaintiff's testimony focused on her job with NOVA as being "pretty demanding" and "not something you just go in and do" in describing her inability to work. [Doc. 32-4 at 25.] Plaintiff also testified that she began working as a senior database

administrator and security analyst with another company approximately six months after her termination with NOVA. [Doc. 32-4 at 3.] Thus, in addition to showing the short-term nature of the limitations on her ability to work, Plaintiff's subsequent employment in a similar field further demonstrates that her limitations were specific to the NOVA working environment. On August 24, 2005, Dr. Gyurik wrote that Plaintiff "is in good remission" and "can function except in previous job situation." [Doc. 32-39 at 2.] In light of such overwhelming evidence of the relatively short-term and job-specific limitations in this case, the evidence simply does not support a finding that Plaintiff is disabled on the basis of a physical or mental impairment that substantially limits the major life activity of working.

In her response brief, Plaintiff contends that Defendants' statement of facts and failure to question the qualifying nature of her disability during the relevant period create a genuine issue of material fact as to the issue of whether she is disabled. The ADA recognizes that "disability" includes "being regarded as having such an impairment" that substantially limits one or more of the major life activities of such individual. 42 U.S.C. § 12102(2). The Supreme Court has held that "[t]here are two apparent ways in which individuals may fall within this statutory definition: (1) a covered entity mistakenly believes that a person has a physical impairment that substantially limits one or more major life activities, or (2) a covered entity mistakenly believes that an actual, nonlimiting impairment substantially limits one or more major life activities." *Sutton*, 527 U.S. at 489. Thus, the "regarded-as-disabled" definition of disability applies to situations where employees are "perfectly able" to perform a job, but they are "rejected . . . because of the 'myths, fears and stereotypes' associated with

disabilities.'" *Gruener v. Ohio Cas. Ins. Co.*, 510 F.3d 661, 664 (6th Cir. 2008) (alterations in original) (citations omitted). In *Gruener*, the Sixth Circuit found that the plaintiff's regarded-as-disabled claim completely lacked proof when she admitted that her employer's "understanding of her impairments and how they limited her simply tracked the specific and valid restrictions prescribed by her own doctor." *Id.* at 665; *see also Cannon v. Levi Strauss & Co.*, 29 F. App'x 331, 336 (6th Cir. 2002). In other words, such evidence did not evidence a mistaken belief on the part of the employer, rather the evidence only spoke to the plaintiff's actual inability to perform the activity. *Gruener*, 510 F.3d at 664.

Likewise in the present case, Plaintiff communicated to NOVA via email her inability to work and need to "take short-term disability." [Doc. 32-27 at 2.] Plaintiff also acknowledged in her deposition that she was "unable to work" at NOVA when she took short-term disability leave. [Doc. 32-4 at 25.] Furthermore, in *Plant v. Morton Int'l, Inc.*, the Sixth Circuit held that a plaintiff was not disabled when he came "forward with no evidence to show that he fits within [the statutory] definition of disabled, other than to suggest that because [the employer] made accommodations for [his] medical restrictions, it viewed him as disabled." 212 F.3d 929, 938 (6th Cir. 2000). Thus, there is insufficient evidence that Defendants "regarded" Plaintiff as disabled, and summary judgment will be granted as to the disability discrimination claim. *See Sutton*, 527 U.S. at 489. Because Plaintiff has failed to establish the prima facie case for her disability discrimination claim, it is unnecessary for the Court to address the arguments regarding the essential job functions issue as it relates to her disability discrimination claim.

## D.     ADA - Retaliation for Opposing Disability Discrimination

Plaintiff also claims that Defendants violated the ADA when they allegedly retaliated against her for opposing disability discrimination.[1]  The ADA provides that "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter."  42 U.S.C. § 12203(a).  To establish the prima facie case for disability retaliation, a plaintiff must show: (1) that she engaged in protected activity; (2) that she suffered adverse employment action; and (3) that a causal connection existed between the protected activity and the adverse action.  *See Penny v. United Parcel Serv.*, 128 F.3d 408, 417 (6th Cir. 1997). If the prima facie case of retaliation is established, the burden shifts to the defendant to proffer "a legitimate, nondiscriminatory reason for the adverse employment action." *Id.* The plaintiff then "bears the ultimate burden of proving that the proffered reason for the action was merely a pretext for discrimination." *Id.* (citation omitted).

The first two elements of the prima facie case are not disputed.  Rather, Defendants contend that Plaintiff's retaliation claim must fail because she (1) has provided no evidence of a causal connection between the protected activity and denial of any accommodation or the termination for her employment and (2) cannot establish that NOVA's proffered

---

[1]The Court notes that Plaintiff is not precluded from prevailing on her disability-retaliation claim even though her underlying claim of disability fails.  *See Bryson v. Regis Corp.*, 498 F.3d 561, 577 (6th Cir. 2007).

legitimate reason for terminating her employment was pretext for retaliation. Plaintiff responds that if Defendants were found to have wrongfully withheld the 24/7 on-call accommodation after her doctor requested it on February 7, 2005, this fact establishes that Defendants' motive for failure to accommodate was at least partly due to her asserting her disability status and right to accommodation.

The Court finds that Plaintiff has presented sufficient evidence for the causal connection element of Plaintiff's disability-retaliation claim. The Sixth Circuit has recognized that "[w]here an adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of satisfying the prima facie case of retaliation." *Mickey v. Zeidler Tool and Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008). In the present case, the close temporal proximity between Plaintiff's August of 2005 requests for an accommodation of unpaid leave and her termination as of September 6, 2005, sufficiently satisfies the causal connection element. [Docs. 32-34 at 3; 32-39 at 1-4; 32-40 at 2.] In addition to close temporal proximity, there is evidence that after Plaintiff requested an accommodation in October of 2004, Art Schwartz ("Schwartz"), a member of NOVA's human resources staff, asked Plaintiff questions suggesting NOVA's unperceptiveness toward her accommodation request. [Doc. 40, Ex. 28 (including "Have you considered getting another job?" and "Has your therapist considered what you will do if these accommodations cannot be met?").] As the Sixth Circuit has previously recognized, "temporal proximity may establish a causal connection between protected activity and an

adverse employment action" when it is "coupled with evidence of retaliatory conduct." *Clay v. United Parcel Serv., Inc.*, 501 F.3d 695, 718 (6th Cir. 2007). Accordingly, summary judgment will not be granted on the basis that there is a lack of causal connection evidence.

Though Defendants argue that it is illogical for NOVA to have accommodated Plaintiff with six months of leave only to retaliate against her six months later by terminating her position, the Sixth Circuit found a similar argument unpersuasive in the summary judgment context. *Cehrs v. Northeast Ohio Alzheimer's Research Ctr.*, 155 F.3d 775, 784 (6th Cir. 1998) (rejecting an employer's argument that it would be unreasonable to conclude that it would choose to discriminate against the plaintiff and terminate her employment because it had always accommodated her in the past). Just as the Sixth Circuit concluded in *Cehrs*, such argument in the present case is "more appropriate to present to a jury than as a basis for judgment as a matter of law." *Id.*

Under the burden-shifting framework, Defendants have met their burden of offering a legitimate, non-discriminatory reason for the adverse employment action. *See Bryson*, 498 F.3d at 570. Namely, Plaintiff was discharged because her health care provider informed NOVA that Plaintiff would never be able to return to work and that no accommodation would make her return possible. [Doc. 31 at 31.]

The burden then shifts to Plaintiff to show that Defendants' proffered reason is a pretext for unlawful discrimination. *See Bryson*, 498 F.3d at 570. A plaintiff may establish pretext by showing "(1) that the proffered reason had no basis in fact; (2) that the proffered reason did not actually motivate the actions; or (3) that the proffered reason was insufficient

26

to motivate the actions." *Hopkins v. Elec. Data Sys. Corp.*, 196 F.3d 655, 662 (6th Cir. 1999). Though there is evidence that Dr. Gyurik informed NOVA that Plaintiff "cannot return to work at NOVA" on August 2, 2005, it is unclear whether this statement meant that Plaintiff could never return to NOVA as Defendants contend. [Doc. 32-33 at 2.] For instance, Dr. Gyurik indicated that Plaintiff's recommended accommodations would have a duration of "at least 90 D,"indicating that return to NOVA was a possibility after that period. [Doc. 32-39 at 3.] Even though Dr. Gyurik wrote "no" to the question about "specific" accommodations that would allow Plaintiff to perform the essential functions of her position, she also stated that Plaintiff "can function except in previous job situation" and recommended that Plaintiff avoid "precipitating stressors." [Doc. 32-39 at 2.] Based on these answers and because all inferences are construed in Plaintiff's favor, there is a genuine issue of material fact as to whether Dr. Gyurik recommended unequivocally that Plaintiff was unable to return to NOVA. [Doc. 32-39 at 2.] There are further questions about the nature of Dr. Gyurik's recommendation in light of Plaintiff's communications with NOVA on August 2, 2005, and August 31, 2005, stating that her physician thought she could not return to work at NOVA "at this time." [Docs. 32-34 at 3; 32-41 at 2.] Such questions are particularly salient in light of the Sixth Circuit's recognition that medical leave "can constitute a reasonable accommodation under appropriate circumstances." *Cehrs*, 155 F.3d at 783. Such lingering questions and genuine issues of material fact make summary judgment inappropriate as to Plaintiff's disability-retaliation claim.

### E.    FMLA - Entitlement Claim

In her complaint, Plaintiff alleges that Defendants' denial of her request of up to 12 weeks of unpaid leave violated her rights under the FMLA, 29 U.S.C. § 2617(A)(2). Defendants contend that Plaintiff cannot prevail on this claim because she exhausted her entitlement to FMLA leave at the time of her request for additional medical leave. Plaintiff does not address the Defendants' argument in her response brief. [*See* Doc. 45.]

The FMLA provides that "an eligible employee shall be entitled to a total of 12 workweeks of leave . . . [b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612. Under an entitlement theory, the issue is whether the employer provided the employee entitlements set forth in the FMLA. *Edgar v. JAC Prods., Inc.*, 443 F.3d 501, 507 (6th Cir. 2006). To prevail on an entitlement claim, a plaintiff must prove: "(1) that she was an eligible employee; (2) the defendant was an employer as defined under the FMLA, (3) she was entitled to leave under the FMLA, (4) she gave the employer notice of her intention to take leave, and (5) the employer denied the employee FMLA benefits to which she was entitled." *Id.* Also worth noting for the present case, the regulations provide that "the employer may designate the leave [pursuant to a temporary disability benefit plan] as FMLA leave and count the leave as running concurrently for purposes of both the benefit plan and the FMLA leave entitlement." 29 C.F.R. § 825.207(d)(1).

In the present case, Defendants contend that Plaintiff exhausted her FMLA entitlement during her six months of leave from NOVA and, thus, was not denied FMLA benefits when

she was denied her unpaid leave request. In *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 94 (2002), the Supreme Court recognized that the FMLA guarantees employees only 12 weeks of FMLA-compliant leave in a given 1-year period. Additionally, only employees who were prejudiced by a violation of the FMLA could recover. *Id.* at 89; *see also Wilkerson v. Autozone, Inc.*, 152 F. App'x 444, 449 (6th Cir. 2005) (reiterating that "prejudice must be shown before an employer's failure to notify its employee of the FMLA designation will bar the employer from counting the leave against the entitlement.") In *Ragsdale*, the Supreme Court found that an employee was not prejudiced when her medical condition rendered her unable to work for substantially longer than the FMLA 12 week period. *Id.* at 90; *see also Fulham v. HSBC Bank USA*, No. 99 CIV. 11054, 2001 WL 1029051, at *7 (S.D.N.Y. Sept. 6, 2001) (concluding that a plaintiff was not denied any substantive rights under the FMLA when his employer failed to provide notice that his short-term disability would be counted against his FMLA entitlement).

In the present case, Plaintiff was on leave starting around March 14, 2005. [Doc. 32-27 at 2.] On May 1, 2005, Plaintiff wrote to Fluech that she would remain on short-term disability because her "doctor still [had] not released her to return to work" and "notified all the appropriate people at U.S. Bank and the Hartford." [Doc. 32-32 at 2.] On August 2, 2005, Plaintiff communicated to NOVA that she would not be able to return to work at NOVA "at this time" and indicated her hope "to return to work within 60 days." [Doc. 32-34 at 3.] In a letter dated August 31, 2005, Plaintiff asked Fluech for 90 days of unpaid leave. [Doc. 32-41 at 3.] Plaintiff did not return to her employment with Defendants and was

terminated from NOVA on September 6, 2005. [Doc. 32-40 at 2.] Such evidence establishes that Plaintiff was on leave for more than 12 weeks when she requested an additional 60 to 90 days of unpaid medical leave in August of 2005. [Docs. 32-34 at 3; 32-41 at 2.] Similar to the plaintiff in *Ragsdale* whose medical condition rendered her unable to work longer than the FMLA 12 week period, Plaintiff's communications with NOVA indicated that she could not return to work even though she had been on leave for more than 12 weeks. [Doc. 32-34 at 3.] Furthermore, Plaintiff does not dispute the Defendants' contentions regarding her FMLA-entitlement claim in her response brief. Because Plaintiff exhausted her 12 week entitlement of FMLA leave and indicated her inability to return to work by the time such leave was exhausted, she was not denied any substantive rights under the FMLA when NOVA denied her request for unpaid leave. Accordingly, summary judgment will be granted as to Plaintiff's FMLA claim based on the alleged denial of right to unpaid leave.

### F.    FMLA - Retaliation Claim

Under the FMLA, Plaintiff also claims that she was unlawfully retaliated for asserting rights to unpaid medical leave. The FMLA provides that "[i]t shall be unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter." 29 U.S.C. § 2615. Under a retaliation theory, "the issue is whether the employer took the adverse action because of a prohibited reason or for a legitimate nondiscriminatory reason." *Edgar*, 443 F.3d at 508. In analyzing such a claim, the Court applies the *McDonnell Douglas* burden-shifting framework, in which a plaintiff can make out the prima facie case by showing that "(1) she

availed herself of a protected right under the FMLA by notifying the employer of her intent to take leave, (2) she suffered an adverse employment action, and (3) that there was a causal connection between the exercise of her rights under the FMLA and the adverse employment action." *Id.* If the employee satisfies the three requirements, the burden shifts to the employer to proffer a legitimate, nondiscriminatory rationale for discharging the employee. *Id.* Once the employer articulates such a reason, a plaintiff must prove that the articulated reason is mere pretext. *Skrjanc v. Great Lakes Power Serv. Co.*, 272 F.3d 309, 315 (6th Cir. 2001).

Defendants contend that Plaintiff has presented insufficient evidence to establish a causal connection. Specifically, Defendants contend that sole reliance on temporal proximity between Plaintiff's August of 2005 request for unpaid medical leave and her termination on September 6, 2005, is insufficient for the causal connection element. In particular, Defendants rely on *Matricardi v. Astro Shapes, Inc.*, No. 4:04 CV 1317, 2007 WL 2902918, at *14 (N.D. Ohio Sept. 29, 2007), where the district court held that four-month temporal proximity was insufficient to justify an inference of retaliation absent other evidence of a causal connection. However, the *Matricardi* court also recognized "an exception to this general rule exists where the temporal proximity between the protected activity and the adverse employment action is 'acutely near in time,' and in such cases that close proximity is deemed indirect evidence such as to permit an inference of retaliation to arise." *Id.* In the present case, Plaintiff's requested unpaid leave in August of 2005 and was terminated on September 6, 2005. [Docs. 32-34 at 3; 32-40 at 2; 32-41 at 2.] Such acute temporal

proximity between her request for leave and her termination is sufficient evidence for purposes of satisfying the prima facie case.

Under the burden-shifting framework, Defendants have offered the legitimate, non-discriminatory reason for the adverse employment action that Plaintiff was discharged for failing to return from a nearly six month leave after exhausting her FMLA entitlement.

The burden returns to Plaintiff to present evidence that Defendants' proffered reason is mere pretext masking unlawful discrimination. The Sixth Circuit has recognized that while temporal proximity alone may be sufficient to establish a causal connection for the prima facie case, "temporal proximity is insufficient in and of itself to establish that the employer's nondiscriminatory reason for discharging an employee was in fact pretextual." *Skrjanc*, 272 F.3d at 317. In the present case, Plaintiff has not pointed to what evidence establishes pretext as to her retaliation claim. In light of the lack of sufficient evidence to establish pretext, summary judgment will be granted as to the FMLA-retaliation claim.

### G.    Common Law - Wrongful or Retaliatory Discharge

Though Tennessee has "long adhered to the employment-at-will doctrine," an at-will employee "generally may not be discharged for attempting to exercise a statutory or constitutional right, or for any other reason which violates a clear public policy which is evidenced by an unambiguous constitutional, statutory, or regulatory provision." *Crews v. Buckman Labs. Int'l, Inc.*, 78 S.W.3d 852, 857-58 (Tenn. 2002) (citation omitted). Thus, a wrongful or retaliatory discharge action recognizes "that, in limited circumstances, certain well-defined, unambiguous principles of public policy confer upon employees implicit rights

which must not be circumscribed or chilled by the potential of termination." *Stein v. Davidson Hotel Co.*, 945 S.W.2d 714, 716-17 (Tenn. 1997). The elements of a common-law retaliatory discharge claim are (1) that an employment-at-will relationship existed; (2) that the employee was discharged; (3) that the reason for the discharge was that the employee attempted to exercise a statutory or constitutional right, or for any other reason which violates a clear public policy evidenced by an unambiguous constitutional, statutory, or regulatory provision; and (4) that a substantial factor in the employer's decision to discharge the employee was the employee's exercise of protected rights or compliance with clear public policy. *Collins v. AmSouth Bank*, 241 S.W.3d 879, 884 (Tenn. Ct. App. 2007).

In the present case, Plaintiff alleges that her complaints, disclosures, and information provided to Defendants regarding problems and risks to unauthorized access to consumer cardholder information were in furtherance of clearly articulated Tennessee public policy under the Tennessee Identity Theft Deterrence Act ("TITDA"), Tenn. Code Ann. § 47-18-2107. [Doc. 12 at ¶ 58.] Thus, Plaintiff contends that she was terminated in contravention of Tennessee public policy. [Doc. 12 at ¶ 59.] In their motion for summary judgment, Defendants contend that Plaintiff's wrongful discharge claim must fail because (1) she does not complain of activity that violated the TITDA; (2) the statute upon which she relies is inapplicable to the Defendants because the statute expressly excludes persons subject to the Gramm-Leach-Bliley Act of 1999; and (3) she cannot establish that her disclosures were a substantial factor in NOVA's decision to terminate her employment. Plaintiff responds that

TITDA establishes a clear public policy to base her wrongful discharge claim. Thus, the parties only dispute the third and fourth elements required for a retaliatory discharge claim.

As discussed above, the third element of a retaliatory discharge claim involves whether "the reason for the discharge was that the employee attempted to exercise a statutory or constitutional right, or for any other reason which violates a clear public policy evidenced by an unambiguous constitutional, statutory, or regulatory provision." *Crews*, 78 S.W.3d at 862. Plaintiff asserts that TITDA, Tenn. Code Ann. § 47-18-2107, is an unambiguous statutory provision that provides the clear public policy that information holders must protect consumers' personal information from computer security breaches. [Doc. 45 at 38.] In her response brief, Plaintiff relies on statutory sections that define "breach of the security of the system," "information holder," and "personal information." Tenn. Code Ann. § 47-18-2107(a). However, the statute itself only requires information holders to provide notice to Tennessee residents when there is a breach of the security of the system containing personal information about such residents. *Id.*

In her response brief, Plaintiff acknowledges that she is not asserting that Defendants violated any statute, and she is correct that a violation of a law or regulation is not required to establish the third element. As the Tennessee Supreme Court has previously recognized, the "inquiry . . . is not limited to whether a particular law or regulation has been violated; rather, [the] inquiry focuses on whether some 'important public policy interest embodied in the law has been furthered by the whistleblowing activity.'" *Guy v. Mut. of Omaha Ins. Co.*, 79 S.W.3d 528, 538 (Tenn. 2002).

In the present case, the Court is not persuaded that Plaintiff's actions furthered the public policy expressed in TITDA, Tenn. Code Ann. § 47-18-2107. TITDA expressly states that "[t]he provisions of this section shall not apply to any person who is subject to the provisions of Title V of the Gramm-Leach-Bliley Act of 1999." Tenn. Code Ann. § 47-18-2107(i). The Gramm-Leach-Bliley Act of 1999 applies to "financial institutions," which refers to "any institution the business of which is engaging in financial activities." 15 U.S.C. § 6801(a), 6809 (3). Based on the Gramm-Leach-Bliley Act's definition, Defendants are "financial institutions" that are expressly outside the purview of TITDA. Plaintiff's amended complaint relies exclusively on TITDA as to her retaliatory discharge claim, so her alleged reporting of security problems to Defendants would not have furthered the public policy embodied in TITDA since the statute expressly excludes Defendants from coverage. Because Plaintiff has not established the third element of the prima facie case, summary judgment will be granted as to that claim.

## H.   TPPA - Wrongful or Retaliatory Discharge

Tennessee enacted the TPPA to "protect employees from being discharged in retaliation for 'blowing the whistle' on infractions of rules, regulations, or the law pertaining to the health, safety, and general welfare of the public." *Guy*, 79 S.W.3d at 535. The TPPA specifically provides that "[n]o employee shall be discharged or terminated solely for refusing to participate in, or for refusing to remain silent about, illegal activities." Tenn. Code Ann. § 50-1-304(a). The TPPA defines "illegal activities" as "activities that are in violation of the criminal or civil code of this state or the United States or any regulation

intended to protect the public health, safety ore welfare." Tenn. Code. Ann. § 50-1-304(c). Thus, a TPPA plaintiff must show: (1) her status as an employee; (2) her refusal to participate in, or remain silent about, illegal activities; (3) the employer's discharge of the employee; and (4) an exclusive causal relationship between her refusal to participate in or remain silent about illegal activities and her termination by the employer. *Freeman v. Lewisburg Hous. Auth.*, No. M2006-01898-COA-R3-CV, 2008 WL 360607, at *3 (Tenn. Ct. App. Feb. 8, 2008).

In their motion for summary judgment, Defendants contend that summary judgment should be granted on the TPPA claim because Plaintiff's deposition testimony states that there were "many reasons" for her termination, including the whistleblower activities and her medical issues. [Doc. 32-4 at 17.] Plaintiff responds that she is allowed to give inconsistent reasons to explain Defendants' motives for her termination, as provided by the Rules of Federal Procedure. Fed. R. Civ. P. 8(d)(3) ("A party may state as many separate claims or defenses as it has, regardless of consistency.").

Based on the arguments presented, the parties only dispute whether Plaintiff has satisfied the exclusive causal relationship element of the TPPA prima facie case. Though Plaintiff stated that she believed there were "many reasons" for her termination by Defendants, there is other evidence that creates a genuine issue of material fact as to that element. For instance, Brattain, Plaintiff's supervisor, forwarded her March 16, 2005, email to Fluech of Human Resources and wrote, "This is part of the issue. I cannot trust her to do this work and distribute this information appropriately." [Doc. 47, Ex. L.] Notably, Fluech

wrote the letter terminating Plaintiff's employment. [*See* Doc. 32-40.] Such evidence raises

questions as to whether Plaintiff's medical condition, her complaint activity, both, or neither

contributed to Defendants' decision to terminate her employment.[2] Because Plaintiff benefits

from all inferences being construed in her favor at the summary stage, there remains a

genuine issue of material fact as to the exclusive causation element. Accordingly, summary

judgment will not be granted as to the TPPA claim.

## III.    CONCLUSION

For the reasons set forth herein, Defendant Nova Information Systems and U.S.

Bankcorp's motion for summary judgment [Doc. 30] is **GRANTED in part** and **DENIED**

**in part**, whereby Plaintiff's Sarbanes-Oxley claim, Americans with Disabilities Act

disability discrimination claim, Family Medical Leave Act claims, and common law

retaliatory discharge claims are **DISMISSED with prejudice**. The case will proceed to trial

on Americans with Disabilities Act retaliation claim and Tennessee Public Protection Act

claim against Defendants Nova Information Systems and U.S. Bankcorp.

IT IS SO ORDERED.


s/ Thomas A. Varlan
UNITED STATES DISTRICT JUDGE

---

[2]The Court notes that the present case is distinguishable from those cases where parties attempt to create a genuine issues of material fact by filing affidavits that contradict their own deposition testimony. *See Coffey v. Chattanooga-Hamilton County Hosp. Auth.*, No. 98-6230, 1999 WL 824870, at *5 (6th Cir. Oct. 6, 1999). The Sixth Circuit has recognized that "factual disputes . . . found within [the party's] own testimony . . . cannot create a genuine issue of material fact to defeat summary judgment." *Id.* In contrast, the contradicting evidence in the present case goes beyond a party's affidavit, and such evidence creates a genuine issue of material fact.